**Tomas R. HINOJOSA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 3–82–284CR(T).**

Court of Appeals of Texas, Austin.

March 3, 1983.

Discretionary Review Refused June 8, 1983.

Richard Banks, Thomas M. Booker, Salmanson, Smith & Mouer, Austin, for appellant.

Ronald Earle, Dist. Atty., Ralph Graham, Asst. Dist. Atty., Austin, for appellee.

Before PHILLIPS, C.J., and EARL W. SMITH and BRADY, JJ.

EARL W. SMITH, Justice.

In a jury trial, and on his plea of not guilty, appellant was found guilty of theft of more than $10,000, a second degree felony. Punishment was assessed by the jury at confinement in the Texas Department of Corrections for ten years and imposition of a fine in the amount of $10,000, with a recommendation that imposition of sentence as to confinement be suspended and that appellant be placed on probation. Judgment of guilt was entered on the verdict; imposition of sentence as to confine-

ment was suspended and appellant was placed on probation.

While candidly admitting in his oral argument that the evidence might have been sufficient for a finding of guilt of theft, if proper allegations had been set forth in the indictment, appellant states in his brief that "appellant's sole contention is that under the specific allegations in the indictment, the evidence introduced by the state was insufficient as a matter of law to support the conviction." Expanding on that basic contention, appellant asserts that the evidence was insufficient as a matter of law (1) to prove that the person named in each count of the indictment as "owner" had both title to and possession of the property described in the indictment; (2) to prove that the person named in each count of the indictment as owner had title to the property described; (3) to prove that the person named in each count of the indictment as the owner had possession of the property described; and (4) to prove that the person named in each count of the indictment as owner had his judgment affected by a false impression of fact created or confirmed by words or conduct of the appellant.

We will overrule appellant's grounds of error and affirm the trial court's judgment of conviction.

The indictment consisted of multiple counts with each count alleging theft of a check issued by the Austin Independent School District, each check bearing a separate date and a facsimile signature of the person who was president of the Board of Trustees at the time the check was issued. Each check was set out *haec verba* in the separate counts of the indictment. Pursuant to Tex.Pen.Code Ann. § 31.09 (1974) the amounts of the checks alleged to have been appropriated by appellant were aggregated to allege theft of property in excess of $10,000.

In his brief, appellant "concedes [that] the indictment and each count thereof is sufficient and valid on its face to charge him with the offense of theft of property of more than $10,000." Each count of the indictment alleged the owner of the check,

which appellant is alleged to have appropriated, to be the person who was president of the Board of Trustees at the time of appropriation. To illustrate, we will set out the allegations in one of the counts of the indictment, omitting the formal parts and the copying of the check *haec verba:*

the said Tomas R. Hinojosa did then and there knowingly and unlawfully appropriate property, to-wit: one check to the tenor following:

[check set out *haec verba*]

of the value of eight hundred dollars and no cents, from Marvin C. Griffin, the owner thereof, said owner having title to and possession of said property, with the intent to deprive said owner of said property and without the effective consent of said owner, specifically, on or about the 7th day of June A.D., 1978, the said Tomas R. Hinojosa knowingly and unlawfully, and with intent to withhold said property from the owner permanently, did then and there acquire and exercise control over said property other than real property by deception; specifically by creating and confirming by words and conduct a false impression of fact that was likely to effect and did affect the judgment of another, to-wit: the owner of said property, which said false impression of fact the said Tomas R. Hinojosa did not believe to be true and was not true in that the said Tomas R. Hinojosa falsely represented that one Robert Reyes had performed work of the value of eight hundred dollars and no cents for the Austin Independent School District, whereas, in truth and in fact no work had been performed by the said Robert Reyes for said Austin Independent School District; and the said Tomas R. Hinojosa knew that the said Robert Reyes had performed no work for the Austin Independent School District. . . .

Texas Pen.Code Ann. § 31.03 (Supp.1982) provides:

§ 31.03. Theft

(a) A person commits an offense if he unlawfully appropriates property with

intent to deprive the owner of property.

(b) Appropriation of property is unlawful if:

(1) it is without the owner's effective consent . . . .

The indictment properly alleges that the appropriation was without the owner's effective consent.

Texas Pen.Code Ann. § 31.01(4)(A) (1974) provides:

(4) "Effective consent" includes consent by a person legally authorized to act for the owner. Consent is not effective if:

(A) induced by deception or coercion . . . .

"Deception," as used in § 31.01(4)(A), is defined in Tex.Pen.Code Ann. § 31.01(2)(A) (1974):

(2) "Deception" means:

(A) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true . . . .

In analyzing the indictment, it properly alleges:

1.  that appellant appropriated property from the named owner;

2.  with intent to deprive the owner thereof;

3.  that the appropriation was effected by acquiring and exercising control over the property;

4.  that the appropriation by acquiring and exercising control over the property was without the effective consent of the owner; and

5.  that the appropriation could not have been "with the effective consent" of the owner in that appellant acquired and exercised control over the property by deception in the manner and means alleged in the indictment.

Appellant states in his brief that, "this appeal is predicated solely on the sufficiency of the evidence relative to the allegation of ownership, and deception by false pretext. . . ." The question of the sufficiency of the evidence is raised in no other context.

We address first appellant's contention that the evidence is insufficient to prove that the person named in each count of the indictment as "owner" had both title to and possession of the property. The indictment alleged the owner had both title and possession, and the court, in its charge, required the jury to find both before it could convict.

"Owner" is defined by Tex.Pen.Code Ann. § 1.07(24) (1974):

(24) "Owner" means a person who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor.

"Possession," as defined in Tex.Pen.Code Ann. § 1.07(28) (1974) means "actual care, custody, *control, or management.*" [emphasis supplied]

Texas Educ.Code Ann. § 23.01 (Supp. 1982) (effective Aug. 14, 1978) provides:

[t]he public schools of an independent school district shall be under the control and management of a board of seven trustees.

Texas Educ.Code Ann. § 23.26 (1972) reads:

(a) The trustees shall constitute a body corporate and in the name of the school district may acquire and hold real and personal property, sue and be sued, and receive bequests and donations or other moneys or funds coming legally into their hands.

(b) The trustees shall have the exclusive power to manage and govern the public free schools of the district.

(c) All rights and titles to the school property of the district, whether real or personal, shall be vested in the trustees and their successors in office.

(d) The trustees may adopt such rules, regulations, and by-laws as they may deem proper.

Texas Educ.Code Ann. § 23.19 (1972) provides in part:

(d) At the first meeting after each election and qualification of trustees, the members shall *organize* by selecting:

(1) a president, who shall be a member of the board . . . .

Texas Educ.Code Ann. § 23.30 (1972) provides:

(a) The board of trustees of any independent school district may, by resolution, authorize the sale of any property, other than minerals, held in trust for free school purposes.

(b) The president of the board of trustees shall execute *his* deed to the purchaser of such reciting therein the resolution of the board of trustees authorizing the sale. [emphasis supplied]

Texas Educ.Code Ann. § 23.48 (1972) reads:

(a) A standard school fiscal accounting system must be adopted and installed by the board of trustees of each independent school district. The accounting system must be keyed to and correlated with the classifications in the budget with respect to purposes of disbursements and sources of receipts.

Texas Code Cr.P.Ann. art. 21.08 (Supp.1982) provides:

[w]here one person owns the property, and another person has the possession of the same, the ownership thereof may be alleged to be in either. Where property is owned in common, or jointly, by two or more persons, the ownership may be alleged to be in all or either of them. When the property belongs to the estate of a deceased person, the ownership may be alleged to be in the executor, administrator or heirs of such deceased person, or in any one of such heirs. Where the ownership of the property is unknown to the grand jury, it shall be sufficient to allege that fact.

It is clear from the above provisions of the Education Code that: the *trustees,* in the name of the school district, "may acquire and hold real and personal property"; the trustees "shall have the exclusive power to manage and govern the public free schools of the district"; "all *rights* and *titles* to the school property of the district, whether real or personal, shall be *vested* in the trustees and their successors in office" [emphasis supplied]; and the trustees shall adopt such rules and regulations and bylaws as they may deem proper.

It is equally clear that the schools are under the control and management of a board of seven trustees; that the president of the board must be a member .thereof; that the board is authorized to sell any property held in trust for free school purposes; and that when it does so, "[t]he president of the board of trustees shall execute *his* deed to the purchaser...." [emphasis supplied]

■ We therefore hold that by statute the trustees are "owners" in the sense that they hold title to the school property. We further hold that since all seven are "owners," it is sufficient under Tex.Code Cr.P. Ann. art. 21.08 (Supp.1982) to allege ownership in all seven trustees, or in any one of them. Here, the person named in each count of the indictment as "owner" is shown by the evidence to be one of the trustees, to-wit, the president of the board.

Appellant cites cases holding that members of the board of a corporate body can perform no valid act except as a body at a meeting properly convened. However, he cites no cases, and we have found none, that hold the trustees do not hold *title.* Appellant ignores the clear language of the Education Code providing that "all *rights* and *title* " of the district, whether real or personal shall be *vested* in the *trustees....* " [emphasis supplied]

We turn now to the question of "possession." Since the indictment alleged that the named owner [the president of the board] had both title to and possession of the checks appropriated, and since the court, in its charge required the jury to so find, we do not quarrel with appellant's cited authorities holding that the State had the burden to prove both title and possession as alleged.

We have already noted that "possession," as defined by the Penal Code, means "actual care, custody, *control* or *management.*" [emphasis supplied] Once again, in his argument that the State did not meet its burden to prove possession as alleged, appellant ignores the express provisions of the Education Code which provide that the

trustees "shall have the exclusive power to manage and govern the public free schools of the district" and that "the public schools of an independent school district shall be under the *control* and *management* of a board of seven trustees." There can be no argument that the Legislature vested exclusive management and control of the school funds and property in the trustees. The legislative provision is buttressed by the evidence in this case.

Stanley Peterman, employed by the trustees as financial director, had the responsibility of paying various vouchers, bills, and invoices; handling the payroll; and issuing checks to pay bills, accounts, and other expenses incurred by the school district. His power to issue checks was derived from the trustees. He could only issue checks that were in proper payment of accounts, and the expenditure had to be in accordance with the budget approved by the trustees. The rules adopted by the trustees required that, before checks could be issued, proper supporting documentation had to be furnished showing that the district, in fact, had incurred the indebtedness for which the checks were issued. Only two people were authorized to sign checks—the president of the board and Peterman. Peterman, however, had never signed a check. The checks were signed at the time of issuance to the payee by affixing to them the facsimile signature of the president. The president of the board was the only person empowered to have his or her facsimile signature affixed to the checks. The facsimile stamps were kept in the possession of an employee other than Peterman.

This method by which the checks were signed by the president was used because the district issued approximately 10,000 checks each month. The checks were kept in vaults in the administrative offices and were issued only in accordance with the above stated procedures and guidelines. Ordinarily, at the time of the issuance of any particular check the president would not see the check, nor would he have the check in his physical possession. Peterman testified on cross examination that the president "did not have actual control over it

[the particular check] in the sense that he [Peterman] paid that which was authorized by the board of trustees through the budget and board policies."

Carol Keeton McClellan, a past board president, whose facsimile signature was on one of the appropriated checks, testified that: although the trustees act as a body, the president had more responsibilities than the other trustees; as president, she acted as agent for the other trustees; she acted on behalf of the board "as authorized to do so"; she signed deeds and checks; and her name was authorized to be on the checks. She also said that the board expected any disbursements or payments to be in compliance with the budget; the board expected the superintendent to implement the budget as adopted; the board president was the chief budget officer with the responsibility to see that the budget was properly administered; she saw her role as president as "holding title for the board"; and she exercised duties in supervisory roles (such as making sure that tennis courts were properly finished). She further testified that insofar as the issuance of checks was concerned, in her role as president, she occasionally directed that payments be held up pending further investigation. The budget was adopted collectively, she said, and she assumed responsibility for seeing that it was implemented correctly. Though the superintendent managed all facets of the school district, he was under the general direction of the board of trustees. Ms. McClellan testified that she had the responsibility of carrying out what the board had authorized to be done.

When asked if she had the "actual care" of a check, her answer was that she had the responsibility for it, though she did not have the check "in hand." She authorized her signature to be placed upon the checks "to meet the budget" and only for services rendered to the district.

Marvin C. Griffin, one of the board presidents whose signature was on an appropriated check, testified that his consent for his signature to be affixed to checks was based

upon its use for properly authorized bills incurred by the district.

Gustavo L. Garcia, another president of the board, testified that, as a trustee, he was responsible for the district's property. He said that the board approved the budget once a year, and then, during the year, "we do whatever supervision we need or feel is necessary to insure that the proper controls are observed." On occasion, as president, he would withhold payments. (For example, payment for a bill submitted by a firm was withheld because it was in excess of the price that had been agreed upon.) The trustees, he said, held title to the checks. He did not have physical possession of the checks, but to support their issuance, he relied upon the presence of proper documents. The signing of checks was one of the duties he "had to take on."

In *Compton v. State*, 607 S.W.2d 246 (Tex.Cr.App.1979), a theft case, the indictment alleged J. Howard Coonen to be the owner of the property (money) appropriated. The evidence showed that the money was actually owned by a corporation. Coonen was the manager of the corporation's Dallas office. Appellant in that case sold a truck to the Dallas branch of the corporation for a consideration of $11,650. The evidence showed that when a truck was purchased by the Dallas office, the payment check had to come from the corporation's Atlanta office. Two Atlanta employees were in charge of disbursing funds from the Atlanta office. Coonen testified that he was in charge of disbursing corporation funds in the Dallas area. To obtain the funds to pay the appellant for the truck, the Dallas office had to request them from the Atlanta office. Before the Atlanta office could issue any check for payment, prior approval from Coonen or his officer was required. The check in payment for the truck was issued by the Atlanta office in the amount of $411,650. It was mailed directly to the appellant, rather than to the Dallas office. Appellant presented the check for payment. On original submission, the Court of Criminal Appeals reversed the conviction, holding that there was no proof that Coonen was the owner of the check,

because he never had any contact with the funds disbursed to the appellant from the Atlanta office and because the two Atlanta employees who signed the check "were in control of and jointly responsible for funds paid out of that office." The Court said the record showed that Coonen exercised no control over the check at any time. On motion for rehearing, appellant's conviction was affirmed, holding that the two Atlanta employees were required to have Coonen's prior approval before any check could be issued. The Court said, "[f]rom this evidence, Coonen's office did have some control over the funds to be disbursed." The Court further held that Coonen had authority to deal with the funds after the check was issued from the Atlanta office, that both Coonen and the Atlanta accounting office had responsibility for the money; therefore the evidence was sufficient to establish that Coonen was an "owner," as alleged. *Cf. Lawhon v. State*, 429 S.W.2d 147 (Tex.Cr.App.1968).

In the instant case, the trustees, by statute, had *control* and *management* of the school funds. Though the checks were in the physical possession of the finance director, he could not issue a check unless it was for an authorized purpose under the budget adopted by the trustees; in addition, before he could issue a check, supporting documentation, as required by the trustees, had to be in hand. In practice, *no* check was issued which did not bear the signature of the president of the board. Notwithstanding admissions by the various board presidents that they did not have physical possession of the checks at the time of issue, and notwithstanding conclusionary statements made by the presidents, and elicited on cross examination, that control of the checks was in an employee, we hold that under the Penal Code definitions of "owner" and "possession" the president was an owner who had both title to and possession of the checks in question. Appellant cites various rules and regulations of the board of trustees, relating to the duties of the trustees, administrative organization, and superintendent. These rules and regu-

lations do not conflict with the Education Code which gives the trustees the *exclusive* power to *manage* and *govern* the school district. The superintendent and his subordinates were but employees or agents of the trustees. *Pena v. Rio Grande City Consolidated Independent School District, et al.,* 616 S.W.2d 658 (Tex.Civ.App.1981, no writ). Mere custody of property by an employee or servant of the owner does not operate to take the property out of the possession of the owner. *Walker v. State,* 591 S.W.2d 493 (Tex.Cr.App.1979); *Washington v. State,* 408 S.W.2d 717 (Tex.Cr.App.1966); *Robinson v. State,* 382 S.W.2d 271 (Tex.Cr. App.1964).

We now pass to appellant's final contention that the evidence was insufficient as a matter of law to prove that each person named in each count of the indictment as the owner of the property had his judgment affected by a false impression of fact created or confirmed by words or conduct of the defendant. Appellant obviously misconstrues the allegations of the indictment concerning deception. According to the definition of theft as set out in § 31.03 of the Penal Code, a person commits the offense of theft if he unlawfully appropriates property with intent to deprive the owner of property. The appropriation is unlawful if it is without the owner's effective consent. In determining what is "effective consent," we look to § 31.01(4)(A) of the Penal Code. There, we learn that "effective consent" *includes consent by a person legally authorized to act for the owner,* and that consent is not effective if "induced by deception." As we have already noted, deception is defined by Tex.Pen.Code Ann. § 31.01(2)(A) as follows:

(2) "Deception" means:

(A) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true. . . .

That is to say, if there is effective consent by a person legally authorized to act for the owner, for the taking of property, the consent is that of the owner, and there is no theft. But, if consent of the person legally authorized to act for the owner is obtained by deception, the consent is *not* effective, and the property has been appropriated without the owner's effective consent.

Appellant argues that since the owners never saw the checks before issuance, and did not know of the transaction, their judgment could not have been affected. Appellant ignores the plain meaning of the Penal Code hereinabove set out. In the instant case, the owner consented, through the finance director, to the issuance of the various checks; but consent was given only because of the deception pleaded in the indictment and proved at trial.

■ Appellant was authorized to employ consulting personnel, if this could be done within the constraints of the budget. He knew that to obtain a check for the work he claimed was done by the payees of the check he had to certify that they had performed services for which the checks were issued. He falsely certified that the work had been done, furnished false supporting documentation, obtained the checks, and cashed them. He knew that the checks would bear the signature of the president of the board, and that the finance director, as the board's agent, would be relying on his written words and his conduct, which created a false impression of fact that he knew to be untrue. The evidence shows that the checks in the hands of the finance department were only authorized to be issued for services performed, and that neither the owners nor their legally authorized employees would have authorized the issuance of the checks had they known the falsity of appellant's representations that the services had been performed. Consent to the issuance of the checks was secured by deception practiced on a person legally authorized to act for the owner, and thus upon the owner. Appellant's fourth ground of error is without merit and we overrule it.

The judgment of conviction is affirmed.

PHILLIPS, C.J., not participating.